**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J. and SELF, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**August 9, 2017**

# In the Court of Appeals of Georgia

A17A1253. CAMACHO v. THE STATE.

SELF, Judge.

Following a jury trial, Marcos Benitez Camacho was convicted of trafficking in methamphetamine. Camacho appeals the denial of his amended motion for new trial, asserting that the trial court erred (1) in charging the jury on the law of deliberate ignorance, (2) in allowing the State to impeach Camacho by questioning him about a previous, unrelated arrest, (3) in admitting hearsay testimony, and (4) in permitting the State to make prejudicial remarks in closing argument. Finding no error, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence showed that on April 17, 2015, federal agents with the U.S. Department of Homeland Security/Homeland Security Investigations ("DHS") arranged for a confidential

informant ("the CI") to make a controlled delivery[1] of over 44 kilograms of methamphetamine to a member of a drug trafficking organization ("DTO"). The methamphetamine, with a street value of $12,000 to $18,000 per kilogram and $1,000 per ounce, was wrapped in 189 individual packages and concealed in a hidden compartment in the trunk of a trap vehicle that was to be driven by the CI. The trap vehicle was a white Ford Fusion outfitted with a GPS device and a kill switch, allowing agents to remotely and immediately disable the vehicle if necessary. A second confidential informant had contacted members of the DTO to arrange delivery of the drugs and that informant relayed the DTO's instructions to federal agents, who then passed them along to the CI. The CI knew he was delivering drugs to the DTO, but he did not know what kind of drugs; he was merely told to wait for "some Hispanic males[] [t]hat will come and. . . pick up the car."

With undercover agents following him, the CI drove the Fusion to the parking lot of a Lowe's in Gwinnett County, where other undercover agents had set up

---

[1] Agents explained that a controlled delivery is used to further the investigation into a drug trafficking organization. The goal of a controlled delivery is to identify the individuals or co-conspirators involved in drug trafficking organizations. Agents testified that they alerted the Georgia State Patrol of the controlled delivery and advised them to have officers in the area ready to establish probable cause to conduct a "whisper stop" of the "trap vehicle."

surveillance. A red pickup truck driven by two Hispanic men entered the parking lot followed by several counter-surveillance vehicles. The CI made contact with the red pickup truck and handed the driver the keys to the Fusion. The men in the pickup truck asked the CI to drive the Fusion three exits north on I-85, but he refused. They handed the CI a cellphone and he advised the person on the other end that he could not drive the Fusion any farther. The men from the pickup then said, "let's go over here to the apartments and get. . . these two persons" and left the parking lot in the pickup truck.

About fifteen minutes later, the red pickup truck returned, followed by a black Acura. Camacho was sitting in the passenger seat of the Acura and his pregnant wife was driving. Camacho exited the Acura and met with the two men driving the pickup truck. All three men then met the CI who handed the Fusion keys to the two men and they handed the keys to Camacho. The CI showed Camacho and the two men how to operate the Fusion's hidden compartment by putting the key in the ignition, turning on the defroster, and then pressing a button on the backseat allowing it to fold down, revealing the drugs. When the hidden compartment was exposed, the wrapped

packages and a red bag were in plain view to all four men.[2] The CI explained that the red bag needed to be returned with the vehicle because it contained drugs he was delivering to someone else. The CI then left the three men and walked into the Lowe's.

Camacho drove the Fusion out of the parking lot followed by the red pickup truck and a Chrysler 300 sedan that agents had identified as a counter-surveillance vehicle. Undercover agents followed as Camacho drove north on I-85 with his wife in the front passenger seat. At approximately 6:39 p.m., Georgia State Troopers Anthony Munoz and John Morris, who had been advised of the controlled delivery, stopped Camacho on I-85 for operating his vehicle in the rain without headlights and driving with an inoperable brake light. As soon as Camacho was stopped by the police, the red pickup truck took off at a high rate of speed. The undercover agents did not pursue the pickup truck because of safety concerns.

---

[2] The CI was not wearing a wire during the delivery. At trial, the State introduced photographs depicting the events as described by the CI, up until the time the CI met with Camacho and the two men from the pickup truck. Special Agent Jason Saude explained that he took the photographs from a distance, but that he could not photograph the CI's meeting with Camacho and the two men because a truck arrived before the pickup truck and Acura returned to the parking lot and blocked his view of the Fusion.

After approaching the Fusion, Munoz noticed Camacho's wife in the passenger seat and explained that DTOs often use decoys in vehicles to keep from being stopped. Decoys include passengers, particularly children, a Bible on the dashboard, or a sticker "on the back of [the] car to try to affiliate [the driver] with something to try to keep. . . an investigator. . . from looking at [the driver.]. . ." Munoz observed that Camacho was very nervous and shaking when he presented a Mexico driver's license issued to Yadir Galarza Leon. Camacho told Munoz that he lived in Marietta and that he was driving a friend's vehicle to visit cousins in Gainesville, but he could not provide the friend's name. On the video captured by Munoz's dashboard camera, Camacho's wife is seen walking from the Fusion to the patrol car and she appears to enter the back of the patrol car. After she exits the patrol car and returns to the Fusion, one of the troopers says that Camacho's wife told him that they borrowed the vehicle from a friend so she could attend a doctor's appointment the following day. Camacho signed a Spanish consent to search form and just as Munoz and Morris opened the trunk, Camacho's wife began complaining of labor pains. Munoz called for an ambulance and Camacho's wife was transported to the hospital. In the hidden compartment of the trunk, the police discovered 189 packages of methamphetamine:

5

150 loose packages and 39 packages in the red and black duffle bag. Camacho was taken into custody.

At trial, Camacho testified in his own defense. He explained that he worked as a day laborer and that he and his wife would wait to be picked up for work at a Quik Trip close to their home in Marietta. On April 17, 2015, Camacho and his wife "came over. . . to 285" to wait for work. At approximately 1:30 p.m., a small red pickup truck with two men inside pulled up to Camacho and one man explained that he had just bought a car and needed someone to help him drive the car to a mechanic "on Exit 105. . . ." The men told Camacho they would pay him $80 to $100. Camacho agreed and he and his wife followed the red pickup truck to a mall where they waited for over two hours for the car to arrive. While they waited in the mall, the pickup truck left but returned a short time later and the driver told Camacho that "they weren't willing to bring the car to Exit 104. They've left it at Exit 101." Camacho drove his black Acura to the Lowe's parking lot and his wife rode in the passenger seat because she "doesn't know how to drive." Camacho arrived five to ten minutes after the red pickup truck and parked one spot away from "the white car." As soon as Camacho pulled up to the white car, the driver got out and "went inside the store really, really fast." Camacho did not see him and the man did not "really [get] a good

6

look at [Camacho]." One of the men from the red pickup truck handed Camacho the keys to the white car and instructed him to drive the car up to Exit 105 and drop it at a mechanic shop; the men said they would follow Camacho to the exit and then get in front of him so he could follow them to the shop and then they would drive Camacho and his wife back to their car. Camacho did not know where the mechanic shop was. He testified that he just wanted to earn some money and could not explain why the men in the pickup truck asked him to drive the white car when there were two of them. No one ever told Camacho about a secret compartment in the car or that there were drugs in the car.

Camacho testified that he was on his way to the mechanic shop on I-85 when he was stopped by Munoz. Because Camacho does not speak English, he and Munoz could not understand each other. He told Munoz the car belonged to a friend because it was too difficult to explain why he was driving the car to a mechanic shop. Camacho testified that Munoz asked him if he had family in Gainesville and he said yes; he denied telling Munoz that he was going to visit family in Gainesville. Camacho denied any involvement with a Mexican drug cartel or the drug business, and testified that he had no idea drugs were in the car and had never transported drugs. Camacho testified that he has used several different names and fake

7

identification cards and that he gave Munoz a false identification card on April 17, 2015, because he had been deported under the name "Marcos Benitez Camacho." He also lied to Munoz about his birthday. On November 28, 2008, Camacho was stopped for possession of cocaine and released on bond. A year later, he was arrested for driving under the influence and deported to Mexico. Camacho has been deported three or four times, but returns to the United States each time with the help of "Coyotes"[3] because there are no jobs in Mexico. Camacho's family living in the U.S. pays a Coyote $4,000 to $5,000 each time for Camacho to return to the United States after he is deported.

DHS Special Agent Steven Ledgerwood explained that DTOs are made up of components and members, with each member having a different job. For example, when a member arrives from Mexico or Guatemala, the member's first job might be to sit in an apartment and watch over 50 kilos of drugs. As a member moves up in the organization, the member will perform duties such as making deliveries, moving money, supervising junior members, and renting apartments and obtaining cars for the organization. Eventually, the member will communicate with Mexico to

---

[3] Camacho defined a "Coyote" as a person who is paid to transport people to the United States from Mexico.

8

coordinate drug deliveries. Ledgerwood testified that it not uncommon "to find drugs without money" because the DTOs hold a member's family accountable: if drugs end up missing or stolen, the family of a member asked to watch over the drugs could be killed.

1. In his first enumeration of error, Camacho contends that the trial court erred by charging the jury, over objection, on deliberate ignorance. The court charged the jury as follows:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. Again, whether or not you draw such an inference is a matter solely within your discretion.

Camacho contends that the charge was not warranted because the evidence points to actual knowledge. Camacho also asserts that the charge "misled the jury since it equated knowledge with intent, . . . significantly [lowering] the State's burden of proof."

9

(a) Camacho's claim that the charge as given misled the jury is without merit. "The only requirement regarding jury charges is that the charges, as given, were correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence." (Footnote omitted.) *Sims v. State*, 296 Ga. App. 461, 464 (3) (675 SE2d 241) (2009). The deliberate ignorance charge given by the trial court in this case was a correct statement of law and tracked the language which was approved in *Able v. State*, 312 Ga. App. 252, 261 (3) (b) (718 SE2d 96) (2011).

(b) We agree with the trial court that there was some evidence to support a jury charge on deliberate ignorance.

> [A] jury charge on deliberate ignorance or wilful blindness is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.

*McCullough v. State*, 330 Ga. App. 716, 721 (1) (769 SE2d 138) (2015). "A [trial] court should not instruct a jury regarding deliberate ignorance 'when the evidence *only* points to either actual knowledge or no knowledge on the part of the defendant.'" (Emphasis supplied.) *United States v. Schlei*, 122 F3d 944, 973 (II) (D) (11th Cir. 1997), citing *United States v. Stone*, 9 F3d 934, 937 (11th Cir.1993), cert.

10

denied, 513 U. S. 833 (115 SCt 111, 130 LEd2d 58) (1994).[4] "The deliberate ignorance instruction is based on the alternative to the actual knowledge requirement at common law that if a party has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge." (Citation omitted.) *Perez-Castillo v. State*, 257 Ga. App. 633, 634 (572 SE2d 657) (2002). Under Camacho's version of events, there was some evidence that he blatantly ignored evidence of nefarious activity. Camacho believed he was driving the Fusion to a mechanic shop in exchange for $80 to $100. He did not question the men in the pickup truck as to why they needed his assistance when there

[4] Camacho cites to *Williamson v. State*, 300 Ga. App. 538 (685 SE2d 784) (2009) to support his argument that the trial court erred in charging the jury on deliberate ignorance. In *Williamson*, this Court stated that "[a] court should not instruct a jury on deliberate ignorance when the evidence points to actual knowledge or no knowledge on the defendant's part." Id. at 549 (6), citing *United States v. Schlei*, supra, 122 F3d at 973. However, as is apparent when comparing the language of *Williamson* and *Schlei*, as quoted in the body of this opinion, this Court omitted the word "only" in *Williamson*, possibly creating confusion on the issue of when it is appropriate for the trial court to give a jury charge on deliberate ignorance. Accordingly, we reiterate that a trial court should not instruct a jury on deliberate ignorance when the evidence presented at trial *only* points to either actual knowledge or no knowledge on the part of the defendant and take this opportunity to clarify our statement in *Williamson* and those cases relying on *Williamson*. See *McCullough v. State*, 330 Ga. App. 716, 721 (1) (769 SE2d 138) (2015); *Hutchins v. State*, 326 Ga. App. 250, 259 (3) (756 SE2d 347) (2014); *Able v. State*, 312 Ga. App. 252, 258 (3) (718 SE2d 96) (2011).

11

were two of them, and even though he testified that he did not know the location of the mechanic shop, he made no inquiry as to why the men planned to *follow him* on the highway. The trial court did not err in giving a charge on deliberate ignorance. See, e.g., *Garcia-Maldonado v. State*, 324 Ga. App. 518, 522 (751 SE2d 149) (2013) (evidence sufficient to prove that defendant acted with deliberate ignorance when he drove vehicle containing 446.74 grams of methamphetamine without question to a motel in return for promise of $500).

2. In his second enumeration of error, Camacho contends that the trial court erred in allowing the State to impeach his character by questioning him about his 2008 arrest for possession of cocaine. The State contends that Camacho opened the door by answering the following questions on direct examination:

> [DEFENSE COUNSEL]: Are you in the drug business?
> [CAMACHO]: No.
> [DEFENSE COUNSEL]: Have you ever knowingly transported drugs at any point in your entire life?
> [CAMACHO]: No.

Before the prosecutor cross-examined Camacho, the following colloquy occurred outside the presence of the jury:

> [THE STATE]: [Defense counsel] asked the defendant if – when he was deported, and he said he was deported in 2011/2012. [Defense counsel] asked him if he was deported under the name of Marcos Benitez Camacho and that's

12

why he had a false identification, and he said he was. [Defense counsel] then later on asked had he ever transported any drugs. Judge, I have evidence that he was deported in 2008 – in 2009 from a 2008 possession of cocaine case. . . . Judge, I believe that's fair game. He's opened the door to that. . . . I believe I can get into that.

THE COURT: Any comment one way or the other, [defense counsel]?

[DEFENSE COUNSEL]: Yes, Judge. I mean, we don't know any of the circumstances, I don't believe, around – about this particular event. . . . There's no – the question was, have you ever knowingly transported or – transported – I think that was the word –

[THE STATE]: You said, transported drugs, not large quantities –

[DEFENSE COUNSEL]: Yeah.

[THE STATE]: – not kilogram amounts. Transported drugs.

[DEFENSE COUNSEL]: Well, I. . . have no idea whether he's transported anything or not.

[THE STATE]: He knows.

[DEFENSE COUNSEL]: The bottom line though is – I'm kind of at a loss to see how that would actually seriously impeach him. I did not ask if he possessed drugs. I asked if he transported drugs – knowingly transported drugs.

[THE STATE]: And if you'd look at our trafficking statute, Judge, trafficking is possessing.

[DEFENSE COUNSEL]: But possessing is not necessarily trafficking.

THE COURT: No, it's not.

[THE STATE]: I agree. I agree.

THE COURT: But unless he stood perfectly still as he possessed drugs on that prior occasion, there's some element of transportation likely implied in any sort of possession – well, maybe not any sort of possession – or, at least, there's the argument. Do you have a copy of that earlier conviction?

[THE STATE]: No. I just have the GCIC report, Judge, for the arrest, and he was deported for that offense.

[DEFENSE COUNSEL]: I don't. . . believe that there was a conviction, I –

[THE STATE]: No, no, he was deported and then they nolle prossed the –

THE COURT: Oh. All right. I'll let you ask him.

13

Defense counsel did not interpose an objection during the bench conference or when the State asked Camacho on cross-examination about the arrest. The defense then rested and the State called a rebuttal witness. Following this witness, Camacho moved for a mistrial, arguing that the State's reference to the alleged charge "improperly injected [Camacho's] character without any sort of good faith basis for doing so." The trial court denied the motion. Pretermitting whether the allegation improperly impugned Camacho's character, there was no contemporaneous objection. "The failure to object contemporaneously constitutes a waiver." *Merritt v. State*, 255 Ga. 459, 460 (2) (339 SE2d 594) (1986) (although defendant moved for a mistrial, testimony of another witness intervened between objectionable testimony and motion, and defendant made no contemporaneous objection), citing *Cape v. State*, 246 Ga. 520, 524 (5) (272 SE2d 487) (1980) (same). Moreover, "[a] motion for mistrial not made at the time the testimony objected to is given is not timely and will be considered as waived because of the delay in making it." (Punctuation omitted.) *Sweeney v. State*, 233 Ga. App. 862, 865 (4) (506 SE2d 150) (1998), citing *Worley v. State*, 201 Ga. App. 704, 705 (2) (411 SE2d 760) (1991).

3. In his third enumeration of error, Camacho contends that the trial court erred in failing to act under OCGA § 17-8-75 on two occasions. We disagree.

14

(a) Camacho argues that the trial court impermissibly allowed the State to admit hearsay testimony of his wife, who was not present at trial, in violation of OCGA § 17-8-75. The alleged hearsay testimony occurred during the State's cross-examination of Camacho:

> [THE STATE:] And do you remember the portion of the video where Trooper Morris is talking to your wife, and he comes back to Trooper Munoz and he stated, she said, that they got the car from a friend for a doctor's appointment they're going to tomorrow in Duluth?
> [CAMACHO:] I don't know how she could have said all of that when she doesn't speak English or anything.
> [THE STATE:] Why would your wife lie about the doctor's appointment and why you all got the car if you all didn't have knowledge there were drugs in that car?
> [CAMACHO:] Nobody – nobody e0ver said that to me, and I didn't hear that. It's until now that I – it's only now that I'm even hearing that.

Camacho waived any challenge to this testimony on hearsay grounds by failing to object at trial. *Edwards v. State*, 282 Ga. 259, 260 (4) (646 SE2d 663) (2007) (because defendant did not object to alleged improper hearsay testimony on hearsay grounds, he failed to preserve issue for appeal). Moreover, Camacho cannot rely on OCGA § 17-8-75 to rectify this omission. OCGA § 17-8-75 provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. *On objection made*, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor

15

to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

(Emphasis supplied.) OCGA § 17-8-75 "only requires the judge to act where counsel makes a timely objection." (Citation omitted.) *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

(b) In addition, Camacho contends that the trial court violated OCGA § 17-8-75 by not rebuking the prosecutor for making three "highly prejudicial" remarks during closing argument. At the beginning of closing argument, the prosecutor stated, "[Defense counsel] is going to get up here like he did in his opening statement, like he's told you throughout this trial, and he's going to try to disparage these men who are in an undercover capacity today as they are on every day *when they're out there protecting our lives*." (Emphasis supplied.) Camacho did not object to this statement at trial, but on appeal, he contends it impermissibly bolstered the credibility of the State's witnesses. At another point during closing argument, the prosecutor argued as follows:

But did you all notice one thing when I asked [the CI] to identify [Camacho] and asked him what he was wearing, [the CI] said something very interesting and I don't know if you all caught it. He said,

16

[Camacho] was wearing a white shirt, and then he said, on the day of [Camacho] was wearing a white shirt. You know, [today] he's got [on] stripes, you know. Well, in the trooper video, if you see the trooper video, when he comes out [of the black Acura], he's got a solid white shirt on when his jacket's open. How would [the CI] know that? How would [the CI] – he had never seen that trooper video. It's not something that's shown to confidential informants. It's because he met him. He met him in that Lowe's parking lot.

Camacho did not object to this argument at trial, but now alleges that it impermissibly bolstered the CI's testimony by arguing facts not in evidence. Lastly, Camacho takes issue with the following statement which he contends improperly inserted into the trial the prosecutor's personal experience: "Those drugs go missing, somebody's going to die in Mexico. Somebody's family is going to die in Mexico. I've prosecuted murderers in this courthouse because of drug debts." Camacho objected to this statement and moved for a mistrial, which the trial court denied.

For the same reasons stated in Division 3 (a), supra, Camacho's claim of error as to the first two statements is waived because he failed to object. As for the third statement, we find no reversible error. "Parties enjoy 'considerable latitude' when making closing arguments." (Citation omitted.) *Hunt v. State*, 219 Ga. App. 741 (1) (466 SE2d 894) (1995). Further, in ruling on a motion for mistrial made in response

17

to an alleged inflammatory statement, the trial court "is vested with a broad and sound discretion, and [its] ruling will not be controlled by this [C]ourt unless manifestly abused." (Citation omitted.) *Edwards v. State*, 219 Ga. App. 239, 243 (2) (d) (464 SE2d 851) (1995). Although not artfully worded, the prosecutor's statement insinuated that the jury should convict for the safety of the community or to curb the problem of drug-related violence. Such a plea is not improper and the trial court did not abuse its discretion in denying Camacho's motion for a mistrial. See id. (trial court did not abuse its discretion in denying motion for mistrial when prosecutor argued that if defendant were not convicted of trafficking in cocaine, three-year-olds will be gunned down in the streets of Cleveland, Ohio). See also *Philmore v. State*, 263 Ga. 67, 69 (3) (428 SE2d 329) (1993) ("It is not improper for a prosecutor to appeal to the jury to convict for the safety of the community, [Cit.], or to argue as a part of the jury's duty that it should convict so as to stem a drug problem in the community, [Cit.], or to convict so as to send a message to others that criminal activities will not go unpunished.").

*Judgment affirmed. Dillard, C. J., and Ray, P. J., concur*.

18