**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**June 27, 2018**

# In the Court of Appeals of Georgia

A18A0177. LOWERY v. THE STATE.
A18A0178. WEIDMAN v. THE STATE.

MCMILLIAN, Judge.

Co-Defendants Matthew Daniel Lowery and Susan Lorraine Weidman appeal from the denial of their motions for new trial following their convictions under the Georgia Racketeer and Corrupt Organizations Act ("RICO"), OCGA §§ 16-14-1 et seq. (the "Act"). Finding no error, we affirm.

Viewed in the light most favorable to support the verdict,[1] the evidence showed that between February and September 2011, as part of a plan to assert claims of adverse possession against a series of properties in DeKalb, Forsyth, and Fulton Counties that had been foreclosed upon, Weidman, Lowery, Ian Greye, and Giulio

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Greye[2] broke into and occupied homes located on those properties, even though they had no valid legal right to do so. In connection with these activities, Weidman and Ian Greye signed a written agreement entitled "Susan Weidman's Real Estate Acquisition Method Profit Sharing and Non-Disclosure Agreement" (the "Agreement") on February 14, 2011. After reciting that Weidman had "developed a proprietary method for claiming abandoned property and seeks the assistance of Ian Greye to execute the business model[,]" the Agreement provided that Weidman would identify suitable "abandoned" properties and take steps to assert legal claim to them, while Ian Greye would physically occupy the properties. Exhibit A was a printed list of "Abandoned Properties Claimed by Susan Wiedman," and additional properties were later added to the Agreement.

---

[2] Although the Greyes were also named in the same indictment as Weidman and Lowery, they apparently pleaded guilty to the charges before trial and they are not parties to these appeals.

*Lowery's actions*

To meet his obligations under the Agreement, Ian Greye enlisted Lowery, who was a close childhood friend, to help in occupying the numerous properties identified by Weidman. The evidence showed that Lowery lived for some period in three of the nine properties listed in Exhibit A to the Agreement: 6645 Shade Tree Way in Cumming, Forsyth County, Georgia ("Shade Tree"); 130 Champlain Street, in Decatur, DeKalb County, Georgia ("Champlain"); and 7975 Spalding Hills, Fulton County, Georgia ("Spalding Hills") (collectively, the "Properties").

Lowery's girlfriend, Kelly Cude, testified at trial that she met Lowery when he was staying at Shade Tree and moved in with him shortly thereafter. When confronted at Shade Tree by the realtor who was handling the sale of the property, Lowery presented a lease purporting to show that he had rented the property through a company called "Hillsdale Property Management." Lowery and Cude left that property about three weeks after Cude moved in when the police told them they needed to find another place to live and the electricity was cut off. When the police arrived to tell them they could not stay there, Lowery not only claimed to be a tenant but he also completed a form provided by police, representing himself as Weidman's

victim and indicating that he wanted to press charges against her. Lowery also represented to a news reporter that he had paid Weidman "a large amount of rent" for Shade Tree.

Lowery and Cude next moved to Champlain for about a week[3] before moving to Spalding Hills. Before Lowery and Cude moved there, Lowery went with Weidman to visit the property, where he saw Weidman remove for-sale signs and enter the house through the back door. Cude said Lowery "seemed really freaked out" by Weidman's actions at Spalding Hills, but they decided to move in anyway. They stayed there about a week and could only enter the house through the back door or the garage. When officers from the Sandy Springs Police Department inspected Spalding Hills in October 2011, they discovered that the ceiling in the garage was ripped out and the door leading from the garage inside the house had been kicked open. They also found furniture and personal items inside the house, including a wristband from a hospital with Lowery's picture and name on it and a medical receipt with Cude's name on it. Despite Lowery's claims to be a paying tenant at Shade Tree, Cude testified that Lowery had no job or any other source of income while they were living together, and he never paid rent to live in any of the three houses.

_____

[3] The evidence showed that Ian Greye was the primary occupant of Champlain.

4

*Weidman's Actions*

After the realtors hired to sell the foreclosed Properties (collectively, the "Realtors") discovered the Greyes and/or Lowery residing in the houses or other evidence of occupation, they undertook steps to remove the occupiers from the Properties, including summoning police or offering to pay them to leave as a cheaper alternative to the eviction process. On some of these visits, the Realtors and police observed Weidman at the Champlain and Spalding Hills properties, and a motion-activated video camera installed by the realtor at the Shade Tree house captured photographs of Weidman unloading furniture from a van into the house. Lowery and Ian Greye also identified her to police and the press as the purported landlord of the Shade Tree and Champlain properties.[4] While police were at Champlain on or around September 13, 2011, Weidman informed them that she had filed a claim of adverse possession against the property "as an experiment to see what would happen in the courts." A television reporter was also on the scene and interviewed Weidman, and

[4] The bank that owned the three Properties hired an attorney to represent its interests in connection with Weidman's and Lowery's occupation of them. He testified that at no time did Weidman, Lowery, or the Greyes have permission to be on any of the Properties.

5

during that interview, she admitted that she was occupying and allowing others to occupy the Champlain property based on a claim of adverse possession.[5]

After the police and/or Realtors visited the Properties and confronted its occupants, the Realtors received cease and desist letters from "Susan Hoffman" and/or "Jonathan Levin," who purported to be attorneys affiliated with the law firm of "Gates, Levin, & Hoffman" located at 1050 East Piedmont Road in Marietta, Cobb County, Georgia. Some of the Realtors also received documentation and correspondence reflecting that an entity named "Hillsdale Property Management" was purporting to be the leasing agent and was located at the same Cobb County address. After the broker representing Shade Tree was unable to locate either an attorney named "Susan Hoffman" or a law firm named "Gates, Levin, & Hoffman," he contacted the State Bar of Georgia to file a complaint alleging the unauthorized practice of law. The State Bar of Georgia pursued that complaint and determined that the bar had no record of "Gates, Levin, & Hoffman," "Susan Hoffman," or "Jonathan Levin" practicing law in Georgia. On September 27, 2011, a bar investigator conducted a telephone interview with Weidman, who admitted making up the names

---

[5] The defense played a DVD showing that and other media interviews with Weidman, Ian Greye, and Lowery for the jury.

6

of "Gates, Levin, & Hoffman" and its purported lawyers and signing and sending the correspondence in their names. The matter was subsequently referred to the Cobb County District Attorney's office.

*Investigation and charges*

In October 2011, Weidman and Lowery were arrested and criminally charged in DeKalb County in connection with the occupation of the Champlain property, but the matter was later transferred to Cobb County, where Weidman resides. An investigator with the DeKalb County District Attorney's office investigated Weidman and Lowery in connection with that county's charges. A search warrant was executed on Weidman's Cobb County home, and the investigator testified that the search resulted in the discovery of the Agreement signed by Weidman and Ian Greye, as well as loan documents, and copies of correspondence with certified mail receipts from "Gates, Levin, & Hoffman," and other fictitious entities and persons. In addition, police found a rental agreement between Weidman and a third-party corporation that rented mailboxes to the general public and was located at the 1050 East Piedmont Road address. The investigator also conducted a short interview with Weidman in which she admitted that she had moved into Champlain as part of an experiment in adverse possession.

Weidman and Lowery were ultimately charged in Cobb County with three counts of violating Georgia RICO: Count 1 – Conspiracy to Acquire Property Through a Pattern of Racketeering Activity; Count 2 – Acquiring Property Through a Pattern of Racketeering Activity; and Count 3 – Participating in an Enterprise Through a Pattern of Racketeering Activity. A jury convicted Weidman on all three counts and acquitted Lowery on Count 1, but the jurors convicted him on the remaining counts.

*Case No. A18A0177*

In Case No. A18A0177, Lowery asserts that the State's evidence of venue was insufficient to support his RICO convictions and that the trial court erred in instructing the jury on the concept of deliberate ignorance.

1. *RICO venue.* Lowery asserts that the State failed to prove that Cobb County was the proper venue for the RICO charges against him because the evidence showed that he was not personally involved in any racketeering activity in that county, and thus he contends that his convictions should be reversed.

Our Supreme Court has held that "venue is a jurisdictional fact and an essential element that the State must prove beyond a reasonable doubt for every crime." *Lanham v. State*, 291 Ga. 625, 626 (2) (732 SE2d 72) (2012). See also *Jones v. State*,

8

272 Ga. 900, 901 (2) (537 SE2d 80) (2000). Generally, under Georgia law, "defendants should be tried in the county where the crime occurred. OCGA § 17-2-2 (a)." *Lanham,* 291 Ga. at 626 (2). Georgia's RICO statute has its own venue provision defining where a RICO crime occurs. At the time of the crimes charged in this case, that statute provided that "[i]n any criminal proceeding brought pursuant to this chapter, the crime shall be considered to have been committed in any county in which an incident of racketeering occurred or in which an interest or control of an enterprise or real or personal property is acquired or maintained." See former OCGA § 16-14-11.[6]

Here, the only incidents of racketeering activity that the indictment alleges occurred in Cobb County are incidents of mail fraud under 18 U.S.C. § 1341 including letters sent by Weidman to the Realtors and others representing that they were from the fake law firm.[7] "Venue under Georgia's RICO act [that] is premised

---

[6] The venue statute was amended in 2015, approximately four years following the commission of the charged crimes and one year after the trial in this case, to delete the phrase "brought pursuant to this chapter," following "criminal proceeding." Ga. L. 2015, p. 693 § 2-25/HB 233.

[7] For example, the allegations regarding mail fraud specifically identify two cease and desist letters Weidman sent on February 22 and May 16, 2011 ostensibly from "Gates, Levin, & Hoffman" threatening legal action against the realtor handling the Shade Tree property and seeking to maintain control of the property "along with

upon a predicate act of mail fraud can be placed only in counties from which, to which, or through which such mailings occurred." *Dover v. State*, 192 Ga. App. 429, 433 (2) (385 SE2d 417) (1989). Lowery does not dispute that the cited mailings were sent from or through Cobb County, nor does he dispute that Cobb County is the proper venue for such acts. Further, he does not dispute that Weidman sent the fraudulent letters or that she is guilty of mail fraud.[8] Rather, Lowery contends that because the State presented no evidence showing that he participated in these acts of mail fraud or any other acts of racketeering activity in Cobb County, venue was not proper in that county as to the charges against him.

In support of this argument, he notes that the jury acquitted him of Count 1 of the indictment, which charged Weidman, Lowery, and the Greyes "individually and as parties concerned in the commission of a crime," with unlawfully conspiring "to acquire directly and indirectly control of property through a pattern of racketeering

---

Matthew Lowery."

[8] And based on our review of the record, we find that the evidence was sufficient to support a finding that Weidman committed the acts of mail fraud as alleged in the indictment. See *Jackson*, 443 U.S. 307. The evidence showed that she admitted to sending the fake correspondence from "Gates, Levin, & Hoffman," she rented a mail box in Cobb County as an address for the fake entities, and copies of the fraudulent correspondence were found in her Cobb County home.

10

activity" in violation of OCGA § 16-14-4 (c). Based on this acquittal, Lowery argues that he cannot be considered a party to the crime of, or part of a conspiracy to commit, mail fraud and contends that the State cannot rely on the incidents of mail fraud to lay venue for his RICO convictions on Counts 2 and 3 of the indictment.[9]

The gist of Lowery's argument, therefore, is that the Act's venue provision requires not only that an incident of racketeering have occurred in the county bringing the RICO charges, but also that each defendant alleged to have participated in the enterprise and pattern of racketeering activity must have personally committed an act of racketeering activity in that county or have participated in a conspiracy to commit a racketeering activity in that county. However, the plain language of the RICO statute imposes no such requirement.

---

[9] In Count 2, Lowery was charged jointly with Weidman and the Greyes, "individually and as parties concerned in the commission of the crime," with participating in an enterprise through a pattern of racketeering activity in violation of the OCGA § 16-14-4 (a) by acquiring and maintaining, "directly and indirectly, control of property, contrary to the laws of said State[.]" Count 3 of the indictment similarly charged Lowery and the others, individually and as party to a crime, of unlawfully participating, directly or indirectly, in an enterprise in violation of OCGA 16-14-4 (a), through a pattern of racketeering activity. Both of these counts specifically incorporated all the allegations of acts of racketeering activity in the indictment, including, inter alia, the acts of mail fraud in Cobb County.

When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-73 (1) (751 SE2d 337) (2013). Courts, thus, sometimes rely on the rules of English grammar as "guideposts by which ordinary speakers of the English language commonly structure their words, and the legislature is presumed to know the rules of grammar." (Citation and punctuation omitted.) Id. at 173 (1).

In the RICO venue statute, the indefinite article "an" precedes "incident of racketeering." OCGA § 16-14-11. When used as an indefinite article, "an" refers to a person or thing that is not identified or specified, as opposed to the definite article "the." See *Indefinite Article*, MERRIAM WEBSTER https://www.merriam-webster.com/dictionary/indefinite%20article (last visited June 25, 2018). Thus, read in its most natural and reasonable way, venue is appropriate in any county where any of the incidents of racketeering occurred, not just the incidents of racketeering involving the particular defendant.

12

Although our appellate courts have not directly addressed this issue, this reading of OCGA § 16-14-11 is consistent with how our courts have treated RICO venue. In *Chancey v. State*, 256 Ga. 415, 432-33 (6) (349 SE2d 717) (1986), our Supreme Court rejected a defense argument asserting that the State must prove that two acts of racketeering activity were committed in the same county in order to establish venue in that county. The Court noted that if the defense argument were correct, RICO venue "would lie nowhere if each predicate crime had been committed in a different county." Id. Later, in *Graham v. State*, 282 Ga. App. 576, 580 (3) (639 SE2d 384) (2006), involving RICO violations alleging conspiracy, this Court found that although the evidence failed to show that one of the named defendants had committed any acts in the county in which the charges were brought, "the evidence presented was sufficient to show that at least one predicate act of the conspiracy took place in [that county] and that venue was proper there." See also *Davitte v. State*, 238 Ga. App. 720, 725 (2) (520 SE2d 239) (1999) ("[A]t least one of the predicate acts for the RICO charge must have been committed in the county in which the criminal proceeding is brought.").

Here, even though Lowery was acquitted of the RICO charge expressly alleging a conspiracy, the charges of which he was convicted required proof of a

pattern of racketeering activity "in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents," former OCGA § 9-14-3 (8) (A), as well as participation in a common enterprise.[10] The evidence supported a finding that Lowery was involved with a group of individuals led by Weidman who participated in the common enterprise, that Lowery committed at least two acts of racketeering in furtherance of their scheme, and that Weidman committed the predicate act of mail fraud in Cobb County.[11] Because the evidence at trial showed

---

[10] At the time of the crimes charged against Lowery, the Act defined the term "enterprise" broadly to include any "group of individuals associated in fact although not a legal entity" and incorporates "illicit as well as licit enterprises." Former OCGA § 16-14-3 (6). A charge asserting a " pattern of racketeering activity" required proof that a defendant "engag[ed] in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents[.]" Former OCGA § 16-14-3 (8) (A). "Racketeering activity" means "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit" any of a list of crimes chargeable by indictment. Former OCGA 16-14-3 (9) (A).

[11] Although the State presented no evidence showing that Lowery himself mailed any fraudulent correspondence or directly participated in any act of racketeering activity in Cobb County, nothing in Georgia's RICO provisions requires that Lowery have participated in, or even have been aware of, all the alleged acts of racketeering activity committed in connection with the common enterprise. *Thompson v. State*, 211 Ga. App. 887, 890 (1) (d) (440 SE2d 670) (1994) (RICO Act does not require that "each defendant in an enterprise have full knowledge of all facets and elements of the enterprise and all its members or actors."); OCGA § 16-14-4.

14

that an incident of racketeering activity as alleged in Counts 2 and 3 occurred in Cobb County as part of a common enterprise or scheme, we find that the evidence was sufficient to support a finding that Cobb County was a proper venue for the RICO charges against Lowery. See *Brannon v. State*, 243 Ga. App. 28, 32-33 (2) (530 SE2d 761) (2000) (defendant's actions in aiding and abetting distribution of drugs in a particular county established venue in that county even though defendant did not personally distribute drugs or commit other acts of racketeering activity there); *Davitte*, 238 Ga. App. at 726 (2) (a) (same). Compare *Dover*, 192 Ga. App. at 433 (2) (State failed to establish venue in county based on predicate act of mail fraud, where no evidence showed mail going from or through that county).

2. *Improper jury charge*. Lowery also argues that the evidence at trial did not support the trial court's charge on deliberate ignorance and that the charge improperly relieved the State of its burden to disprove his defense of mistake of fact. At the close of evidence and argument, the trial court gave the State's requested charge on deliberate ignorance over objections from both Defendants, instructing that

> [t]he knowledge element of a violation of a criminal law can be proved by demonstrating either actual knowledge or deliberate ignorance of criminal activity. Under the concept of deliberate ignorance, the requisite knowledge can be shown where a Defendant has his suspicions

15

aroused, but then deliberately omits to make further enquiries because he or she wishes to remain ignorant.

After the jury charge, Lowery's trial counsel renewed his objections and took exception to this charge as given.

In Georgia, "[a]n instruction on deliberate ignorance is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." (Citation and punctuation omitted.) *Aguilera v. State*, 293 Ga. App. 523, 525 (1) (667 SE2d 378) (2008). However, "[a] court should not instruct a jury on deliberate ignorance when the evidence points to actual knowledge or no knowledge on the defendant's part." (Citations omitted.) *McCullough v. State*, 330 Ga. App. 716, 721 (1) (769 SE2d 138) (2015). Lowery argues that the trial court erred in giving the charge in this case because evidence only pointed to his having either actual knowledge or no knowledge of the alleged enterprise. We disagree.

Lowery's defense in this case was that he was acting under a mistake of fact because he believed that Weidman was the owner of the Properties. However, the evidence showed that Lowery was forced to leave Shade Tree after Forsyth County

16

police told him she was not the owner, they instructed him to leave the property, and the electricity was cut off. Nevertheless, he continued his dealings with Weidman, later moving to the Champlain and Spalding Hills properties under what he claims was the mistaken belief that Weidman owned and rented those properties. Before moving to Spalding Hills, he went with Weidman to that property where he observed her remove the realtor's for-sale signs and enter the house through the back door. Cude testified that Lowery was shaken by what he observed but chose to move to Spalding Hills anyway. We find that this evidence was sufficient to present a jury issue as to whether Lowery's suspicions were aroused but he nevertheless deliberately chose not to make further enquiries, because he wanted to remain in ignorance. *Camacho v. State*, 342 Ga. App. 637, 641 (1) (a) (804 SE2d 660) (2017); *Able v. State*, 312 Ga. App. 252, 259 (3) (a) (718 SE2d 96) (2011); *Aguilera*, 293 Ga. App. at 525 (1); *Perez-Castillo v. State*, 257 Ga. App. 633, 635 (572 SE2d 657) (2002). See also *Polite v. State*, 273 Ga. App. 235, 242 (8) (614 SE2d 849) (2005) ("To authorize a jury instruction on a subject, there need only be produced at trial slight evidence supporting the theory of the charge.") (citation and punctuation omitted).

Lowery also contends that the charge was prejudicial error because it relieved the State of its burden to disprove his only defense, mistake of fact. Once again, we

17

disagree. The trial court charged the jury that Lowery was presumed innocent, that the State bore the burden of proof as to every allegation in the indictment beyond a reasonable doubt, and that the State, not Lowery, bore the burden of proof as to his defense, requiring that the prosecution negate or disprove any defense raised by the evidence. The trial court also charged the jury that the State bore the burden of proving beyond a reasonable doubt that Lowery had knowledge "that the crimes alleged in the indictment were being committed and that [he] knowingly and intentionally participated in or helped in the commission of such crimes[.]" It is well settled under Georgia law that "the knowledge element of a violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance of criminal activity." *Able*, 312 Ga. App. at 258 (3) (noting that this Court "has repeatedly recognized" this principle). Here, the charge as given was a correct statement of the law, and we find that it did not mislead the jury or relieve the State of its burden to prove knowledge. See *Camacho*, 342 Ga. App. at 641 (1) (a) ("The only requirement regarding jury charges is that the charges, as given, were correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence." (citation and punctuation omitted). We find no error.

18

In Case No. A18A0178, Weidman asserts error by the trial court in connection with a hearing held pursuant to an untimely OCGA § 24-4-404 (b) ("404 (b)") notice and in denying her request for a jury charge on mistake of fact. Weidman also asserts that her trial counsel was ineffective in failing to object to the 404 (b) hearing and in failing to file a motion in limine to stop the State from eliciting testimony that she was a "sovereign citizen" or a "con artist."

3. *404 (b) hearing*. Weidman asserts that the trial court erred in holding the hearing based on a 404 (b) notice filed on the first day of trial and in ultimately granting the motion. She also asserts that she received ineffective assistance of counsel to the extent that her counsel failed to raise a valid objection to the untimely notice.

(a) *Timeliness of 404 (b) notice*. Just prior to the voir dire in this case, the State filed a "Notice of State's Intent to Introduce Defendant's Other Acts Pursuant to OCGA § 24-4-404 (b)." The trial court held a hearing on the motion prior to voir dire, and Weidman's counsel began his response to the State's argument by stating, "Judge, I think the first . . . question we have is whether or not the timing or we have proper notice. And after looking at the 404 (b), I guess . . . it's pretty much [a] wide

19

open option for the State to do to anybody." He then moved on to arguing the merits of the motion. Although Weidman argues on appeal that this statement should be interpreted as an objection to the timeliness of the notice, her counsel never sought a specific ruling on any such objection, and the trial court granted the State's request to introduce evidence.

When the prosecution seeks to introduce evidence under Rule 404 (b), it is required to provide "reasonable notice" to the defense before the trial. OCGA § 24-4-404 (b). Prior to the institution of the current Evidence Code, former Uniform Superior Court Rule ("USCR") 31.3 required notice of the State's intent to introduce evidence of similar transactions and a hearing in order to decide whether the evidence was admissible. Former USCR 31.3 (A), (B). Under the current Evidence Code, the introduction of other acts evidence is governed by OCGA § 24-4-404 (b), which incorporated former USCR 31.3's notice requirement, but not its mandatory hearing requirement. *Everhart v. State*, 337 Ga. App. 348, 352 (2) (a) (786 SE2d 866) (2016). Our Supreme Court has determined under the prior law that the failure to object to the timeliness of the notice under former USCR 31.3 waived the issue for appeal. *Williams v. State*, 298 Ga. 208, 211 (1) (a) (779 SE2d 304) (2015). We find no reason to treat the notice requirement under Section 404 (b) any differently. The trial court

20

found, and we agree, that Weidman's counsel failed to raise a valid objection, thus waiving any appellate argument that the 404 (b) notice was unreasonable.

Moreover, we find that Weidman has failed to show that her trial attorney rendered ineffective assistance of counsel in failing to raise a valid objection on this ground. In order to show ineffective assistance of counsel, Weidman was required to establish both that her counsel's performance was deficient and that she was prejudiced by that performance, that is, that there is a reasonable likelihood that, but for counsel's errors, the outcome of his trial would have been different. *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If we find that Weidman has failed to meet her burden on either prong of the *Strickland* test, we need not address the other prong. *Strickland*, 466 U.S. at 697 (IV); *Fuller v. State*, 277 Ga. 505, 507 (3) (591 SE2d 782) (2004).

Here, Weidman failed to establish that she was prejudiced by her counsel's failure to object to the timing of the notice. Her trial counsel admitted at the hearing on her motion for new trial that he had prior notice of the 404 (b) evidence, and he objected to and obtained a ruling on the admission of the evidence itself. Additionally, Weidman has failed to point to any action her counsel was prevented from taking or any evidence he could not present due to the same-day notice. Finally,

21

the evidence against her at trial was overwhelming. Under these circumstances, we find no merit to her claim of ineffective assistance of counsel on this ground. See *McNeal v. State*, 289 Ga. 711, 714 (3) (715 SE2d 95) (2011).

(b) *Admission of 404 (b) evidence*. For evidence of other crimes or acts to be admissible under Rule 404 (b), it must be relevant to an issue other than the defendant's character; it must be supported by sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and it must satisfy OCGA § 24-4-403. See *State v. Jones*, 297 Ga. 156, 158-59 (1) (773 SE2d 170) (2015); *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015). Weidman asserts that the proffered evidence was not relevant and did not meet the test under OCGA § 24-4-403 because the prejudicial nature of the evidence outweighed its probative value. We review the trial court's decision regarding the admission of evidence under Rule 404 (b) for an abuse of discretion. *Reeves v. State*, 294 Ga. 673, 676 (2) (755 SE2d 695) (2014).

The 404 (b) evidence was presented through the DeKalb County investigator's testimony at trial. He testified that his research revealed that Weidman had previously been accused of using false and fictitious documents in an attempt to cancel the mortgage on her own Cobb County home (the "Mortgage Cancellation"). A televised

22

news report in the record indicates that Weidman appeared to have been successful in delaying foreclosure on her home through these methods. The investigator also testified that while the DeKalb County charges were still pending against Weidman, she filed a lawsuit in federal court against the judges in DeKalb and Cobb Counties, the Georgia governor, and other officials connected to her legal cases, asserting claims for false arrest, false imprisonment, and malicious prosecution (the "Federal Lawsuit"). After that action was dismissed, Weidman nevertheless attempted to collect money by filing a purported default judgment she drafted herself in federal court and asserting a $65 million claim with the Georgia Administrative Office of Courts. A number of documents relating to the Mortgage Cancellation and the Federal Lawsuit were introduced into evidence.

The State sought to present evidence relating to the Mortgage Cancellation to show motive,[12] intent, lack of mistake, and a "financial interest." The prosecutor explained that the evidence showed that Weidman was having financial difficulties, which prompted her to pursue her plan for claiming "abandoned" properties.

---

[12] We note that OCGA § 24-4-404 (b) specifically eliminates the notice requirement when the other acts evidence is introduced as intrinsic evidence, as evidence of motive, or as evidence of "prior difficulties between the accused and the alleged victim."

23

Likewise, the prosecution sought to present evidence of the Federal Lawsuit in order to show motive, intent, and lack of mistake.

OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As our Supreme Court has recently explained,

> [r]elevance and probative value are related, but distinct, concepts. Relevance is a binary concept – evidence is relevant or it is not – but probative value is relative. Evidence is relevant if it has "*any tendency*" to prove or disprove a fact, whereas the probative value of evidence derives in large part from the extent to which the evidence tends to make the existence of a fact more or less probable.

(Emphasis in original.) *Olds v. State*, 299 Ga. 65, 75 (2) (786 SE2d 633) (2016). Moreover, "the exclusion of evidence under OCGA § 24-4-403 is an extraordinary remedy which should be used only sparingly . . . to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." (Citation and punctuation omitted.) *Dixon v. State*, 341 Ga. App. 255, 260 (1) (b) (800 SE2d 11) (2017).

24

We find that the Mortgage Cancellation and the Federal Lawsuit evidence was relevant to disprove Weidman's defense of mistake of fact and to prove her intent to fraudulently use the court system in an effort to obtain property and gain financially. The Mortgage Cancellation evidence also supports the State's argument that due to her financial situation, Weidman had motive to expand her scheme to properties she did not own.

We also agree with the trial court that under the OCGA § 24-4-403 balancing test, the prejudicial nature of the evidence did not substantially outweigh its probative value. Wiedman's defense strategy was essentially that she had a good faith and reasonable belief that she was not trespassing on the properties. The Mortgage Cancellation and Federal Lawsuit evidence was especially probative of Weidman's state of mind, which the State needed to show to support its case and counter Weidman's defense, because those actions demonstrated that Weidman had in other circumstances falsified documents in an attempt to game the legal system for her own financial gain. We find no abuse of discretion by the trial court in the admission of this evidence.

4. *Counsel's failure to file motions in limine.* Weidman asserts that her trial counsel was ineffective in failing to file a motion in limine to stop the State from

eliciting testimony that Weidman was a "sovereign citizen" and/or a "con artist." As noted above, in order to establish this claim, Weidman must satisfy the two-prong *Strickland* test by demonstrating both deficient performance by her counsel and prejudice. *Sneed v. State*, 337 Ga. App. 782, 786 (3) (788 SE2d 892) (2016).

During the trial, the State presented the testimony of the Clerk of Cobb County Superior Court, who testified that Weidman had signed certain documents filed in the court with the notation "Without prejudice UCC 1-308/1-207," which he said is one indicator of a "sovereign citizen" filing. At the hearing on the motion for new trial, Weidman's counsel testified that he made the decision not to object to this testimony as a matter of trial strategy. Although he would have preferred that the term not be mentioned, he made the decision not to highlight the term by objecting to it. Trial counsel also decided not to object when the realtor associated with the Champlain property testified that he "knew at one point [Weidman] definitely was a con artist[.]" Counsel explained that he chose not to object as "probably more of a trial strategy-type approach . . . than anything else." He stated that the witness "clearly had animosity toward Ms. Weidman," which he felt was strongly evident and undercut the witness's legitimacy with the jury. Trial counsel also stated that he had not considered filing a motion in limine to exclude the use of the term "sovereign citizen" nor did he

26

consider filing such a motion as to the term "con-artist" because he said he was not "really clairvoyant on what somebody might say, [and] would not have anticipated or did not anticipate that [term] coming out."

"Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Brown v. State*, 321 Ga. App. 765, 767 (1) (743 SE2d 452) (2013). "[T]he making of objections falls within the realm of trial tactics and strategy and thus usually provides no basis for reversal of a conviction." (Citations and punctuation omitted.) *Moon v. State*, 288 Ga. 508, 516 (9) (705 SE2d 649) (2011). Likewise, the decision "[w]hether to file pretrial motions and how to argue the motions are strategic decisions, and when reasonable in the context of the case, do not constitute error." (Citations omitted.) *Pitts v. State*, 272 Ga. App. 182, 188-189 (4) (a) (612 SE2d 1) (2005).

Here, Weidman has failed to show that an objection to the use of the term "sovereign citizen" would have been meritorious. Moreover, she failed to show that her trial counsel's strategic decision not to object to the testimony in order not to highlight it for the jury was patently unreasonable. See, e.g., *Mann v. State*, 297 Ga.

27

107, 111 (4) (b) (772 SE2d 665) (2015) (trial counsel's strategy to not object to evidence so as not to highlight it was reasonable). Although counsel did not consider filing a motion to exclude use of the term "sovereign citizen," he was not asked to explain the basis of this inaction, and Weidman has failed to show that such a motion would have been successful. *Johnson v. State*, 275 Ga. App. 21, 25-26 (7) (c) (619 SE2d 731) (2005) (defendant failed to prove claim of ineffective assistance for failure to file a motion in limine where defendant failed to show motion in limine would have been successful). Weidman has also failed to demonstrate that it was patently unreasonable for her trial counsel to fail to anticipate that the realtor would use the specific term "con artist" or to refrain from objecting to the term because he thought

it hurt the witness's credibility.[13] Accordingly, we find that Weidman failed to establish her claim of ineffective assistance of counsel on this ground.

5. *Failure to charge jury on sole defense*. Weidman also asserts that the trial court erred in failing to give her requested jury charge on mistake of fact as it represented her sole defense. During the charge conference, the trial judge stated that although such a charge applied to Lowery, he did not think it was applicable to Weidman. Nevertheless, the trial court gave the pattern jury charge on mistake of

---

[13] Weidman's trial counsel also decided not to object when the realtor testified that Weidman's actions "were just a total fraud," because he believed that evidence had already been introduced that Weidman had sent a letter from a bogus law firm, signed with a fake attorney's name. To the extent that Weidman also contends that her trial counsel should have objected to, or filed a motion in limine to exclude, the term "fraud," we find that she has failed to show that this omission constituted ineffective assistance of counsel for the reasons cited above. Moreover, the RICO charges in this case were based on fraud, and Weidman does not assert that the jury was not properly charged on the issues. See also *Clark v. State*, 300 Ga. 899, 902 (799 SE2d 200) (2017) (in light of proper jury instructions, trial counsel's failure to file motion in limine to prevent State and its witnesses from using term"murder" during murder trial did not constitute ineffective assistance of counsel); *Nguyen v. State*, 279 Ga. App. 129, 133 (5) (b) (630 SE2d 636) (2006) (same for term "rape").

fact,[14] which closely tracked the language of Weidman's requested charge, without limiting its application to either defendant. Therefore, we find no error.

*Judgments affirmed. Barnes, P. J., and Reese, J., concur.*

---

[14] That instruction read: "I charge you that a person shall not be found guilty of a crime if the acts or omission to act constituted the crime was induced by a misapprehension of fact that, if true, would have justified the acts or omission."